147 B.R. 709 (1992)
In the Matter of LAGUNA ASSOCIATES LIMITED PARTNERSHIP, Debtor.
Bankruptcy No. 92-02870-S.
United States Bankruptcy Court, E.D. Michigan, S.D.
August 12, 1992.
*710 Sheldon S. Toll, Honigman, Miller, Schwartz and Cohn, Detroit, Mich., for debtor.
Lisa S. Gretchko, Pepper, Hamilton & Scheetz, Detroit, Mich., for Moving Party Aetna Cas. and Sur.

OPINION GRANTING AETNA'S MOTION TO LIFT STAY
WALTER SHAPERO, Bankruptcy Judge.

FACTUAL BACKGROUND
On March 6, 1992, Laguna Associates Limited Partnership ("Debtor") filed a Chapter 11 petition. Aetna Casualty and Surety Company ("Aetna") filed a Motion for Relief from the Stay pursuant to 11 U.S.C. § 362(d)(1) alleging that the case was filed in bad faith and thus, "cause" exists to lift the stay.
Aetna agreed to advance approximately $19.5 million[1] to Beztak Company ("Beztak"), a Michigan co-partnership pursuant to certain loan documents dated as of July 20, 1988 designed to finance the acquisition and construction costs of a multiple residential rental project, (comprising some thirty (30) acres and some 384 units) is known as Lakeside Terrace Apartments ("Property"). Beztak also owned a contiguous twelve (12) acre parcel which is subject to a mortgage to Manufacturers Bank, N.A., and which Debtor states is vacant or undeveloped realty. The general partners of Beztak are: (a) Beznos Realty Investment Company, a Michigan co-partnership, whose partners are Harold Beznos, Norman Beznos and Maurice J. Beznos, each as trustees of their own separate revocable trusts; and (b) Jerry D. Luptak and Nina D. Luptak, individually. Aetna's loan is secured by a first mortgage on the Property, an assignment of leases and rents and a security interest in fixtures and other personal property used in connection with the Property. The loan may now be a non-recourse loan in whole or in part. The original loan was a construction loan which by its terms was "converted" into a long term loan upon completion of construction. The original note set forth a limited deficiency liability prior to the conversion date, and essentially none afterward (except for certain "Surviving Indemnities"). A contemporaneous Construction Loan Agreement between Beztak and Aetna dated as of July 20, 1988 ("Loan Agreement") does refer to guarantees of certain "guarantors" defined as Harold Beznos, Maurice J. Beznos, Norman Beznos, Nina D. Luptak and Jerry D. Luptak. The extent of those original guarantees is not apparent, nor is the extent, if any, to which, any such guarantees still remain in effect.
Beztak also contemporaneously entered into a "Master Lease" between itself as lessor or "Owner" and each of its general partners as lessees or "Residents." That "Master Lease" essentially provides that:
(a) Beztak retains the right to lease the tenant units to occupants of the units pursuant to an approved lease form at rentals equal to or greater than those set forth in an attached schedule;
(b) The lessees (general partners of Beztak) are liable to Beztak for the rentals for actually occupied units at the rates specified in the schedule, but receive as a credit on that obligation, the amount of all rent actually paid by the lessees (general partners of *711 Beztak) to Beztak (or Aetna) and applied to payment of operating expenses of the subject property and debt service on Aetna's loan.
The Mortgage between Aetna and Beztak citing extensively the importance of Beztak's (and its partners') knowledgeability, background and experience, and their creditworthiness, made assignment by Beztak (or by its partners of their interests in Beztak) or termination of Beztak's existence or change of form of ownership without consent of Aetna, an event of default. In respect to the subject of assignment, Section 5.08 of the Loan Agreement provided that notwithstanding the mortgage, Beztak had a right, once during the term of the loan, to transfer the Property under certain conditions, as well as another assignment right, the provision being as follows:
5.08 Permitted Transfers of Interests in Borrower or Collateral. Notwithstanding anything in the Mortgage to the contrary, Borrower shall have the right once during the term of the Loan to transfer the Property and Improvements without any modification of the terms of the Loan Documents upon the payment to Lender of a fee equal to one percent (1%) of the then current Loan Balance; provided, however, that:
(a) no default or Event of Default shall exist hereunder or under any of the Loan Documents; and
(b) Lender shall have received written notice of the proposed transfer from Borrower at least thirty (30) days prior to the anticipated closing of such transfer, such notice to be accompanied by (i) copies of the transfer documents, (ii) evidence satisfactory to Lender that the proposed transferee meets Lender's customary credit and experience standards, and (iii) payment of the then current processing fee being charged by Lender for its review of such transactions and the fees and expenses of Lender's counsel if any is engaged, and
(c) Borrower shall have complied with all of Lender's customary requirements in connection with the proposed transfer (including, without limitation, the amendment of all UCC financing statements) at no cost to Lender.
Furthermore, Borrower or any partner in Borrower may from time to time upon complying with the requirements of clauses (a), (b) (except subclause (ii)), and (c) above of this Section 5.08, transfer all or any part of its interest in the Property and Improvements to a Permitted Transferee, so long as at all times after such transfer one or more of MB, NB, HB or JL retains (a) a minimum five percent (5%) general partnership interest in any entity which is a Permitted Transferee, and (b) practical control of the business of developing, managing and constructing the Improvements upon the Property.
Debtor, Laguna Associates Limited Partnership, was formed as a Michigan limited partnership on February 11, 1992, which is the date the Michigan Department of Commerce accepted the required filing. The Certificate was received by the Department of Commerce on February 10, 1992 and was stated to have been signed "as of January 2, 1992." Debtor's Certificate of Limited Partnership identifies Beztak as the sole limited partner (and owner of a 99% interest) and Laguna General, Inc. ("Laguna General"), as the sole general partner. Debtor states in its pleadings that the partners of Beztak own 100% of the stock of Laguna General. The bankruptcy schedules and other evidence indicate (a) the Debtor considered itself to be in business from and after January 2, 1992, its "inception," and, (b) the development is managed by Beztak Management Company, an entity related to Debtor.
By letter dated February 28, 1992, and received by it shortly thereafter, Aetna was notified by Debtor's attorney that:
"This letter is to serve as the written notice required under Section 5.08 of the Loan Agreement entered into between The Aetna Casualty and Surety Company, as Lender, and Beztak Company, as Borrower, with respect to permitted transfers of Lakeside Apartments. In accordance with Section 5.08, you are advised that the Borrower is transferring the mortgage property for estate planning *712 purposes to a Michigan limited partnership which is a Permitted Transferee. I have enclosed copies of the transfer documents in accordance with the requirements of the Loan Documents:
1. Quit Claim Deed (executed but not recorded); and
2. Assignment and Assumption Agreement."
The referred to unrecorded Quit Claim Deed:
(a) ran from Beztak as grantor to Debtor as grantee;
(b) was stated to be "Effective as of January 3, 1992";
(c) was acknowledged by a notary public on February 19, 1992;
(d) recited consideration of $10.00; and
(e) conveyed property described in "Exhibit A." Note that both the unrecorded deed sent to Aetna and the recorded deed while referring to only an Exhibit "A", had attached both an Exhibit "A" (describing the thirty (30) acre parcel), and an Exhibit "B" describing the twelve (12) acre parcel (the property covered by the Manufacturers Bank, N.A., mortgage).
That deed was in fact recorded on March 5, 1992 and, as noted, the bankruptcy case was filed on March 6, 1992. The schedules list both the thirty (30) acre and twelve (12) acre parcels among Debtor's assets.
The referred to "Assignment and Assumption Agreement" ("Assignment") was between Beztak and Debtor and stated to have been "entered into and effective as of the 2nd day of January, 1992." The copy furnished with the letter of February 28, 1992 to Aetna was apparently unsigned. That agreement in substance:
(a) was an assignment of Beztak's interest in the tangible and intangible assets relating to the Lakeside Apartments;
(b) was stated to be "subject to trade payables and other liabilities set forth in Exhibit A attached hereto," as they related to operation of the Lakeside Apartments; and
(c) committed the Debtor (as assignee) to adopt and follow the accounting practices, procedures and conventions employed by Beztak with respect to the Property and liabilities assigned and "assumed."
The list of trade payables and other liabilities which was referred to in the Assignment as Exhibit "A" was not attached to the exhibit produced for the Court, purporting to be a copy of what Aetna received. The Exhibit "A" attached to the Assignment which was produced for the Court was rather a legal description of the thirty (30) acre parcel. Another exhibit which is a copy of the signed Assignment does not have attached to it any of the exhibits referred to in the Assignment. Interestingly also, while there are a number of references to an "assumption" of the trade payables and other liabilities in the Assignment and elsewhere in other exhibits before the Court, the operative part of the Assignment in fact says that Debtor takes the Assignment "subject to" same. In any event, insofar as this Court is concerned there is nothing specific before it to evidence exactly what trade payables and liabilities were referred to in the Assignment (i.e. the referred to Exhibit A), nor whether Aetna was, or is now aware of same (other than what may be deduced from the liabilities listed in the bankruptcy schedules filed three (3) months after the "effective date").
As to factual conclusions which may be properly drawn from the foregoing relative to compliance or non-compliance by Beztak and Debtor with the quoted permitted assignment provisions to the extent such compliance or lack thereof is relevant, those facts show that:
(a) in all probability a default under the Loan Documents did in fact exist at the time of the purported assignment, witness at the very least what appears to be the substantial overdue and unpaid realty taxes listed on Debtor's schedules for the year(s) 1990 and 1991;
(b) the anticipated date of "closing of the transfer" might variously be any of January 2 or 3, 1992 (the "as of" date(s) of the Deed and Assignment Agreement) or, February 19, 1992 (the date of the deed acknowledgment) or March 5, 1992 (the date the deed was recorded), or February 11, 1992 (the date the Debtor limited partnership legally first came into existence), or some other date within those time parameters. (The record contains *713 no evidence as to when Debtor's general partner, Laguna General, Inc.,  presumably a Michigan corporation, and one with admittedly no assets, was formed and its Certificate of Incorporation issued  though one can infer it was relatively contemporaneous with the formation of Debtor.) Regardless however, the notice, which was dated February 28, 1992, clearly did not comply with the Loan Agreement's thirty (30) days prior to the anticipated closing notice requirement. The notice sent in effect refers to what was considered by its writer to have been a fait accompli.

(c) Aetna was not then supplied with any of the required evidence relative to whether or not the transferee met Aetna's customary credit and experience standards, nor did the letter refer to any enclosed processing fee.
Section 5.08 of the Loan Agreement also permitted a transfer at any time upon compliance with the same noted requirements (except for that relating to the credit and experience standards) to a "Permitted Transferee" if such also met the noted general partnership ownership percentage requirements. However, the Section 5.08 (a) and (b) requirements were not met in respect to such a transfer, and, there is a legitimate argument or ambiguity as to whether the requirement that one or more of the three named Beznos' and Jerry Luptak (being whom the MB, NB, HB and JL initials apparently refer to) can be said to have the required five (5%) percent general partnership interest in Debtor, considering that the only "general" partner of Debtor is a corporation whose shareholders are those named individuals in some unknown proportions, and considering the definition of a "Permitted Transferee" in the Loan Agreement (which does appear to include a corporation).
The foregoing (plus certain other facts referred to during the further course of this opinion) is essentially the sum and substance of the basic evidence before the Court. While it had an ample opportunity to do so, for whatever reason(s), Debtor chose not to offer any additional evidence.
Relief from the Automatic Stay  Arguments of the Parties
In support of its motion, Aetna asserts that the encumbered Property transferred on the eve of bankruptcy to Debtor, a newly created limited partnership, creates a prima facie case of bad faith (in the factual context of "new debtor syndrome"[2]) to constitute "cause" to lift the stay pursuant to § 362(d)(1).
In addition, Aetna asserts that cause for relief from the stay exists since the transfer of Property from Beztak to Debtor is contrary to the provisions set forth in Section 5.08 of the Loan Agreement and adversely effects Aetna for two (2) reasons:
(1) the transfer and assignment to a newly created Debtor was not a permitted assignment under the terms of the mortgage as a result of the failure to comply with the requirements in Section 5.08 and the fact that the named individuals did not continue as general partners; and
(2) the consequent loss of the individuals acting as general partners eliminates a certain amount of expertise, backup and financial responsibility which would exist and was required to exist and which was bargained for in the Loan Agreement. Therefore, the transfer of the Property increases the risk that Aetna will not be able to recover on its claim because Debtor, unlike Beztak, does not have the financial resources to assist the success of the Property.
As the moving party of a request for relief from the § 362(a) automatic stay, Aetna asserts it has the burden of making an initial showing of a prima facie case of cause under § 362(d)(1), following which, § 362(g) places upon the Debtor the burden of going forward with the evidence and bearing the ultimate burden of proof on all other issues, or "cause" in this case.
In response to Aetna's motion, Debtor relies upon the factors set forth in In re *714 Winshall Settlor's Trust, 758 F.2d 1136 (6th Cir.1985) in support of its assertion that the Chapter 11 petition was filed in good faith. Debtor argues that Aetna's reliance upon the theory of the "new debtor syndrome" is misplaced since it is not recognized by the Sixth Circuit as a basis for dismissal of a petition or lifting of the automatic stay. Debtor asserts that the filing of a bankruptcy by a single asset financially troubled entity and the facts shown in this case do not constitute a prima facie case of a bad faith filing.
Debtor further asserts that the Loan Agreement expressly granted Beztak the right to transfer the Property during the term of the Construction Loan. Debtor admits on page 8 of its brief in opposition to Aetna's motion that Beztak and Debtor "did not dot all the `i's and cross all the t's' under Section 5.08 of the Loan Agreement" when it transferred the Property to the Debtor, but asserts they substantially complied with the terms of that Section. Debtor therefore argues that since Beztak and Debtor did was contemplated by Section 5.08 of the Loan Agreement, such cannot be the basis or premise of a claim of bad faith sufficient to lift the stay.
Debtor argues that Aetna's assertion regarding the burden of proof is wrong. Debtor asserts that where the movant is seeking to lift the stay and/or dismiss the case for bad faith filing, the movant has the burden of proof and persuasion (and a heavy one at that) to establish that the case was filed in bad faith.
Creditors B & V Construction ("B & V") and Manufacturers Bank, N.A. ("Bank") filed responses in opposition to Aetna's Motion. Both parties assert that the Debtor did not file the Chapter 11 proceeding in bad faith and that the creditors would be best served by the Court not lifting the stay and permitting Debtor an opportunity to confirm a plan that is acceptable to the creditors.
Issues
(1) Which party has the burden of proof in a motion for relief from the stay for cause pursuant to § 362(d)(1) based on an allegation of lack of good faith in filing?
(2) Whether the Debtor's conduct in filing the Chapter 11 petition in this case evidences a lack of good faith sufficient to lift the automatic stay?
Burden of Proof
Section 362(d)(1) in effect requires an initial showing of cause by the movant, and Section 362(g) places the burden of proof on the debtor for all issues other than "the debtor's equity in property." 11 U.S.C. § 362(g)(1). See, e.g., In re Sonnax Industries, 907 F.2d 1280, 1285 (2d Cir. 1990); In re Holly's, Inc., 140 B.R. 643, 683 (Bankr.W.D.Mich.1992); In re Powers, 135 B.R. 980, 987 (Bankr.C.D.Cal.1991); In re Abrantes Const. Corp., 132 B.R. 234, 237 (Bankr.N.D.N.Y.1991); In re Kerns, 111 B.R. 777, 786 (Bankr.S.D.Ind.1990); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 985 (Bankr.N.D.N.Y.1988); In re Bingham, 68 B.R. 933, 935 (Bankr.M.D.Pa. 1987); In re Scheffler, 86 B.R. 576, 577 (Bankr.W.D.Wis.1986); In re Dunes Casino Hotel, 63 B.R. 939, 944 (Bankr.D.N.J. 1986); In re UNR Industries, Inc., 54 B.R. 270, 272 (Bankr.N.D.Ill.1985).
The rationale for the automatic stay burden of proof rule is that the automatic stay is intended only to shift the initiative to the creditor to bring the issue before the Bankruptcy Court, and not to create any new right in the debtor to stay proceedings. In re Terry, 12 B.R. 578, 581 (Bankr.E.D.Wis. 1981). This burden includes not only the burden of going forward with the evidence but also the burden of ultimate persuasion. In re Certified Mortgage Corp., 20 B.R. 787, 788 (Bankr.M.D.Fla.1982).
Thus, Aetna is correct in its assertion that if a creditor seeking relief from the stay has made a prima facie case of "cause" for lifting the stay, the burden of going forward shifts to the debtor pursuant to § 362(g). In re Presock, 9 B.R. 676, 678 (Bankr.E.D.Pa.1981).
In Debtor's supplemental brief in response to Aetna's motion it asserts that numerous cases hold that Aetna, as the movant, has a "heavy burden of proof" and persuasion to establish that the case was filed in bad faith. The Court is unpersuaded *715 by the sole case cited in Debtor's brief in support of its position, which is, Lehman  Gibson Associates, Inc. v. Baltimore Joint Venture XVI, 64 B.R. 479, 483 (Bankr.D.D.C.1986). The Court in Lehman  Gibson stated that "the heavy burden of showing bad faith rests with the moving party." In support of this conclusion, the Court relies upon In re Colony Square Co., 22 B.R. 92 (Bankr.W.D.Pa. 1982). Colony Square merely states that "this court is not persuaded that the debtor filed this petition in bad faith. Prudential has not met its burden in this regard." Id. at 98.
Contrary to Debtor's assertions, this Court thus concludes it is not established law that Aetna must meet a heavy burden of proof in order to obtain relief from the stay for cause.
Good Faith Determination
The "good faith" issue has arisen in a variety of circumstances and under a number of statutory provisions, such as motions to dismiss for "cause" under § 707(a), or § 1112(b), or to lift the stay under § 362(d)(1). This Court does not detect a basis or reason for applying varying criteria as to what or what does not constitute good faith, under the different statutory provisions. They all have the concept of "cause" in common, and it is fair to say, as has the Sixth Circuit, that "good faith has evolved as a threshold requirement in all bankruptcy cases." In re Zick, 931 F.2d 1124, 1127 (6th Cir.1991); see also In re Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir.1985). There is no particular test for determining whether a debtor has filed a petition in bad faith. In re Phoenix Piccadilly, Ltd., 849 F.2d 1393 (11th Cir. 1988); In re Natural Land Corp., 825 F.2d 296 (11th Cir.1987); In re Little Creek Development, 779 F.2d 1068 (5th Cir.1986); In re Carco Partnership, 113 B.R. 735 (Bankr.M.D.Fla.1990); In re Yukon Enterprises, Inc., 39 B.R. 919 (Bankr.C.D.Cal. 1984); In re N.R. Guaranteed Retirement, Inc., 112 B.R. 263 (Bankr.N.D.Ill.1990). Instead of a single element good faith test, courts have responded to several distinct grounds for relief, arising from different concerns and reflected in differing factual circumstances, for instance:
(1) The Eleventh Circuit in In re Natural Land Corporation, 825 F.2d 296 (11th Cir.1987), set forth factors in determining whether a petition for reorganization has been filed in bad faith:
(a) the lack of a realistic possibility of an effective reorganization; (b) evidence that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights; (c) whether the debtor is seeking to use the bankruptcy provisions to create and organize a new business, not to reorganize or rehabilitate an existing enterprise or to preserve going concern values or a viable or existing business; (d) the timing of the debtor's relevant actions; (e) whether the debtor appears to be merely a shell corporation; and (f) whether the debtor was created or the subject property transferred to the debtor, for the sole purpose of obtaining protection under the automatic stay of Chapter 11 by filing bankruptcy. 825 F.2d at 298.
(2) Other more specific, but similar factors, are the following considered by the Fifth Circuit in In re Little Creek Development Co., 779 F.2d 1068 (5th Cir. 1986):
(a) the debtor has one asset, such as a tract of undeveloped or developed real property, encumbered by liens of the secured creditors; (b) there are generally no employees except for the principles; (c) there is little or no cash flow and no available sources of income to sustain a plan of reorganization or to make adequate protection payments; (d) there are typically only a few, if any, unsecured creditors whose claims are relatively small; (e) the property has been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending foreclosure in state court or, alternatively, the debtor and creditor have proceeded to a standstill in state court litigation and the debtor has been required to post bond which it cannot afford; (f) bankruptcy offers *716 the only possibility of forestalling loss of a debtor's property; (g) there are sometimes allegations of wrongdoing by the debtor or its principal; and (h) the new debtor syndrome exists in which a one asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors. 779 F.2d at 1073.
(3) The so-called "new debtor syndrome" has been identified as a certain pattern of conduct evidencing bad faith. Courts have established a consistent set of factors to apply in determining whether bad faith exists under the "new debtor syndrome", and there is little difference among the circuits in the actual criteria applied or in the weight given to any of the elements. The case most often relied upon is In re Yukon Enterprises, Inc., 39 B.R. 919 (Bankr.C.D.Cal.1984), in which the court has observed numerous "badges of bad faith" to be present in cases involved in the "new debtor syndrome" including the following:
(1) transfer of distressed real property into a newly created or dormant entity, usually a partnership or corporation;
(2) transfer occurring within close proximity to the filing of the bankruptcy case;
(3) no consideration being paid for the transferred property other than stock in the debtor;
(4) debtor having no assets other than the recently transferred, distressed property;
(5) debtor having no or minimal unsecured debts;
(6) debtor having no companies and no ongoing business; and
(7) debtor having no means, other than the transferred property, to service the debt on the property.
39 B.R. at 921.
In addition, Yukon recognizes the test in determining the existence of bad faith of "whether any of the substantive or procedural rights of any of the creditors to assets, available prior to the transfer of the property, have been altered or eroded by the transfer and subsequent filing." Id. at 921, quoting In re Northeast Recreational Activities, Inc., 4 B.R. 36, 44 (Bankr.N.D.Ga.1980); Duggan v. Highland-First Avenue Corporation, 25 B.R. 955, 961 (Bankr.C.D.Cal.1982).
In the Sixth Circuit, the most prominent good faith cases are the cited Winshall and Zick cases. This Court does not read Winshall as meaning that in every case where a debtor (a) has assets, and (b) an ongoing business, and (c) a reasonable probability of proposing and having a Chapter 11 plan confirmed, good faith perforce exists. In the factual context of that case those factors were decisive, but, in this Court's view, should not be deemed exclusive. In Zick (which did not even mention the Winshall case), the Court did state after saying that dismissal based on lack of good faith must be determined on an ad hoc basis:
It should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets, and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence.
In re Zick, 931 F.2d 1124, 1129 (6th Cir. 1991). Taken literally and exclusively, like Winshall, this language arguably might confine the Sixth Circuit's idea of bad faith to more limited circumstances than those relied on by other courts. Such an interpretation would be at odds with the seemingly universal concept (to which the Sixth Circuit also adheres) that good or bad faith is a uniquely factual matter in which the required showings are as varied as the number of cases in which the issue is raised. Zick and Winshall in the end must be considered in light of the facts in those cases, despite the arguably restrictive language used to dispose of the issue in those cases. Therefore, the Court concludes it may consider any factors which evidence "an intent to abuse the judicial process and the purposes of the reorganization provisions" or, in particular, facts which evidence that the petition was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." In *717 re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir.1984).
In the immediate situation, the Court concludes that due to the factual situation presented, the issue as to whether bad faith exists would be best addressed using the elements set forth in the Yukon case, and further concludes that many of the Yukon factors evidencing a bad faith filing are present in this case.
The Yukon rule should apply in this case of a recent transfer to the Debtor of lien encumbered property, regardless of the fact that the Property is not "distressed"[3] since the new debtor syndrome can be employed for improper purposes with respect to even non-distressed property. In re N.R. Guaranteed Retirement, Inc., 112 B.R. 263, 275 (Bankr.N.D.Ill. 1990). N.R. Guaranteed provides the following example:
An entity in no need of bankruptcy protection can employ a new debtor filing in order to reduce the interest rate on a mortgage that is completely current. The original owner would transfer its mortgaged property to a new entity, and cause that entity to file a Chapter 11 petition. Then, if relief were not accorded to the mortgagee, the new debtor might be able to "cram down" a plan in which the mortgagee was paid the amount of its claim on terms that included a market rate of interest on the mortgage rather than a higher contract rate.
112 B.R. at 275.
Debtor proposes in its plan to impair Aetna's rights by rejecting the Master Lease and restructuring the Mortgage, which was current before the bankruptcy filing, to (a) reduce the interest rate by over 2%, from 10.05% to 7.75%, and (b) extend the term of the Loan by over ten (10) years, from August 1, 1995 to December 31, 2005.
The case for the new debtor syndrome, as a separate "cause" for relief under § 362(d) was stated as follows:
Once a secured creditor establishes that property securing its claim was transferred to the debtor shortly before the filing of a Chapter 11 petition, relief will be granted unless the debtor proves (1) that the transferor of the property was itself in need of bankruptcy relief and (2) that the rights of the creditor were not adversely affected by the debtor's filing instead of the transferor.

N.R. Guaranteed, 112 B.R. at 276.
There was no attempt by Debtor to show Beztak's holdings other than the Property, or Beztak's financial situation as a whole, or that Beztak was in need of bankruptcy relief. One must assume Beztak does have other holdings or the attempted transfer to Debtor would make little or no sense at all. Rather than indicating that Beztak needed to file bankruptcy because of its overall problems, Debtor asserts that as a result of the present economic recession, and in regards to the Property, it experienced problems with tenant occupancy and rental rates and has had insufficient cash flow to pay taxes and service its debt after payment of its normal operating expenses, and that prior to the filing date, it made all debt service payment to Aetna and consistently maintained the Property in a quality fashion  all of which are sufficient to bear its burden of showing good faith. However, Debtor maintains that its persistent vacancy problem and the resulting deficient cash flow forced Debtor to seek protection under Chapter 11. Those problems were Beztak's, not Debtor's problems.
Further, the Debtor did not show that Aetna's rights were not adversely affected by its filing for relief. In fact Aetna made a prima facie showing of prejudice to, or an adverse effect upon it by showing that:
(a) the effect of even a transfer in compliance with Section 5.08 was to isolate the Property from the remaining Beztak holdings; and
(b) considered generally, and in the context of the plan's proposal to reject the Master Lease, the effect was to substitute a corporation owned by Beztak *718 and/or its partners, and a limited partner (Beztak) for Beztak itself as the principal involved in the operation of the Property.
Even if there is basically no personal liability of the partner's of Beztak on the note and Mortgage to Aetna (and even if an assignment to Debtor legally may not extinguish whatever liability Beztak had), there is a certain limited type of liability under the Master Lease, and more importantly there would be the liability to ongoing trade and operating creditors, as owners of the Property, which on a prospective basis would be shielded (from Beztak) as the result of even a proper transfer to this Debtor. The terms of the Loan Agreement indicate Aetna bargained for Beztak's continued direct involvement and ongoing financial responsibility in effect as a general partner. This transcends the matter of whether or not the transfer complied with the provisions of the Loan Agreement. The Debtor's argument on that issue misses the mark. Just because a transfer was improperly effected in a case where there were conditions or restrictions on transfer that had to be met, or, was properly effected in a case where there were no restrictions on transfer as such, does not mean that the fact of the transfer in light of the surrounding circumstances should not be considered in determining good faith. After all, in all "new debtor" type cases there has been a transfer. If that transfer was permitted or contemplated by the parties and that fact alone precludes the finding of bad faith, there would be no such new debtor bad faith cases. That the transfer might not have complied with conditions or restrictions upon it, may help strengthen a bad faith case, otherwise indicated, but compliance with the restrictions will not necessarily eliminate the inquiry. Other relevant factors need to be considered, and indeed bad faith has been found in many cases without any transfer whatsoever.
Essentially what we have in this case is:
(a) a flawed eleventh hour attempt of Beztak and its partners to transfer the Property (and the contiguous twelve (12) acres) to this commonly and in substance similarly held and owned Debtor;
(b) a transferee, asset-less Debtor which appears to have been created solely for the purpose of holding the Property and, it must be inferred, essentially isolating and separating its operations from the remaining operations of Beztak, the transferor;
(c) a situation where the Property cannot itself support its expenses and required debt payments;
(d) the filing of a bankruptcy in close proximity to the transfer or attempted transfer;
(e) a situation where the day to day management, because it remains in the same managerial hands (of an associated entity) as it was before the transfer, will likely not change regardless of the transfer;
(f) a situation, given the asset-less substance of the corporate general partner of Debtor, which materially adversely changes, certainly prospectively, the liability picture relative to the ongoing expenses of operating the Property, with no apparent means, other than the receipts from the Property itself to sustain the Property or pay all of those ongoing expenses;
(g) apparently no consideration being paid for the transfer other than the transferred interests in the Debtor; and
(h) a situation where Aetna suffers the indicated adverse effects upon its bargained for relationship with Beztak.
These facts, in this Court's view present a prima facie case of bad faith under the Yukon and other cited cases, to which Debtor for whatever reason has offered an insufficient response, save possibly the unexplained and ambiguous statement in the notice of transfer to Aetna that it was for estate planning purposes and certain other noted facts. Such a record requires the conclusion that the Debtor has failed to carry its burden of going forward with the evidence and in its ultimate burden of persuasion on the good faith issue, in this case.
Therefore, the Motion to Lift the Stay is granted and the prevailing party should prepare an appropriate order.
NOTES
[1] The amount due under Aetna's loan as of March 6, 1992 was principal in the amount of $17,500,000, plus interest and other charges.
[2] The "new debtor syndrome" is characterized by "a one-asset entity that has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, . . ." In re Little Creek Development Co., 779 F.2d 1068, 1073 (5th Cir.1986).
[3] In this context, the definition of "distressed" is "property that must be sold because of mortgage foreclosure." Black's Law Dictionary, 426 (5th ed. 1979). "Distress" is also involved to the extent the project's cash flow is insufficient to meet its expenses and debt service.