**In re WASHTENAW HURON INVESTMENT CORPORATION NO. 8, Debtor.**

**Bankruptcy No. 92–04545–R.**

United States Bankruptcy Court, E.D. Michigan.

Jan. 11, 1993.

Deborah Fish, Detroit, MI, for debtor.

Barbara Rom, Detroit, MI, for creditor.

SUPPLEMENTAL OPINION

STEVEN W. RHODES, Bankruptcy Judge.

I.

This matter is before the Court on the motion for relief from the stay for cause under § 362(d)(1) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (1989) (the Code), filed by Mutual Life Insurance Company of New York (MONY). MONY's theory is that the stay should be lifted or annulled because the petition was not filed in good faith. Washtenaw Huron Investment Corp. No. 8 (the debtor) contends that the petition was filed in good faith. The parties entered into an extensive stipulation of facts in the pretrial statement, for which the Court notes its appreciation. The Court held an evidentiary hearing and rendered a bench decision on October 23, 1992. This opinion supplements the decision given at that time.

II.

The subject of what constitutes good faith or bad faith in the context of Chapter 11 has been the subject of a fairly large number of bankruptcy decisions, especially recently. This Court has had an opportunity to review a number of those cases and finds itself most in agreement with the

discussion of this issue recently undertaken by Judge Shapero in *In re Laguna Assoc. Ltd. Partnership,* 147 B.R. 709 (Bankr. E.D.Mich.1992). This Court finds persuasive Judge Shapero's discussion of the decisions around the country on this issue and of the two Sixth Circuit cases that deal with the issue of good faith in bankruptcy, *In re Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir.1985) and *Industrial Ins. Services v. Zick (In re Zick),* 931 F.2d 1124 (6th Cir.1991).

After a substantial analysis of the precedents, Judge Shapero concluded that neither *Zick* nor *Winshall* set forth an exclusive rule for determining the existence of bad faith, but rather that the holdings in those cases must be understood in light of the specific facts and issues presented in them. Thus, he stated:

> Such an interpretation would be at odds with the seemingly universal concept (to which the Sixth Circuit also adheres) that good or bad faith is a uniquely factual matter in which the required showings are as varied as the number of cases in which the issue is raised. *Zick* and *Winshall* in the end must be considered in light of the facts of those cases, despite the arguably restrictive language used to dispose of the issue in those cases. Therefore, the Court concludes it may consider any factors which evidence Ivan (sic) "intent to abuse the judicial process and the purposes of the reorganization provisions" or, in particular, facts which evidence that the petition was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984).

147 B.R. 709, at 713.

The issue of whether this case was filed in good faith must therefore be considered in light of the highly unique factual circumstances which led to the filing.

### III.

Because of the highly factual nature of the inquiry before the Court and the complexity of the transaction at issue, a summary of the undisputed facts is necessary.

On June 29, 1988, Main Huron Associates Limited Partnership (Main) borrowed $12.7 million from MONY (the loan), to purchase real property located at One North Main Street, Ann Arbor consisting of residential condominium units and commercial and retail office space (the property). Main executed certain documents in connection with the loan (collectively, the loan documents), including:

a. Note Secured By First Real Estate Lien (the note);

b. Mortgage and Security Agreement (the mortgage) encumbering the retail and office space described as Units 1 and 2 and 16 through 29;

c. Master Lease; and

d. Assignment of Lessor's Interest [in all leases of the property, including the master lease] (the assignment).

Main is a Michigan limited partnership and its general partners are Albert Enterprises Associates Limited Partnership (Albert Partnership), Jon Fox, Harold Koss, and Richard McCoppin. Albert Partnership is a Michigan limited partnership and its general partner is Albert Enterprises, Inc. (Albert Enterprises). Albert Enterprises is a Michigan corporation with the following officers and directors: Mike Kojaian, President and Director; Kenneth J. Kojaian, Vice President, Secretary, and Director; C. Michael Kojaian, Vice President, Treasurer, and Director. Kojaian Management Corp. (Kojaian Management) is a Michigan corporation and its officers and directors are identical to those of Albert Enterprises.

The master lease was executed contemporaneously with the loan documents. The tenants under the master lease are the general partners of Main, and the full performance of the tenants' obligations under the master lease is guaranteed by Mike Kojaian, C. Michael Kojaian, Kenneth Kojaian, Jon Fox, Harold Koss, and Richard McCoppin. The master lease expired in June, 1991.

Approximately $2 million in delinquent lease payments were paid in April, 1991 to Main, and the funds were paid to Main

insiders. At the same time, Main and MONY entered into a letter agreement under which MONY promised not to take any action against the property before May 17, 1991. The purpose of the agreement was to give the parties time to negotiate a settlement.

The debtor was incorporated on January 25, 1991 as M–Tel Corporation; on January 31, 1991 its name was changed to Alanna Corporation, effective January 25, 1991; and on May 1, 1991 its name was changed to its current name and its registered agent was changed from Gregory J. DeMars of Honigman, Miller, Schwartz & Cohn (the Honigman firm) to Adrian J. Balinski. Mr. Balinski is the sole stockholder and president of the debtor.

Main conveyed the property to the debtor by quit claim deed dated May 16, 1991 (the deed), which was recorded with the Washtenaw County Register of Deeds on that date at 4:18 p.m. The closing statement from the sale of the property to debtor recites the payment of $100 net cash to Main for the property, with the purchase price as the lesser of $13,521,666.67 or the "fair market value as determined by an appraiser." Closing Statement, Pl.'s Ex. J. Main and the debtor also executed an "Agreement With Respect To Additional Consideration," dated as of April 28, 1991.

The building in which the property is located is managed by a condominium association (the association). Mr. Balinski is on the board of directors of the association. The association hired Mortgage and Financial Strategies, Ltd. (MFS) to manage the property on its behalf. According to the records of the Michigan Department of Commerce, MFS was incorporated in October, 1988, its registered agent and secretary is John E. Amerman, an attorney with the Honigman firm, and its president is Mr. Balinski. MFS, in turn, subcontracts the management of the property to Kojaian Management. The association pays a management fee equal to five percent of monthly rents. At the 341 examination, Mr. Balinski estimated that the monthly management fee paid to MFS is approximately $5,500, of which approximately $4,000 is paid to Kojaian Management.

After receiving notice of the May 16, 1991 quit claim deed, MONY filed a foreclosure action in Washtenaw County Circuit Court on May 21, 1991, against the debtor and Main. On February 10, 1992, an opinion and order was entered in that case in favor of MONY. The debtor filed its Chapter 11 petition on April 9, 1992, just a few hours before MONY's scheduled foreclosure sale. Unaware that a bankruptcy petition had been filed by the debtor, the foreclosure sale was conducted on April 9, 1992, at which time the property was sold.

The debtor's proposed plan of reorganization filed on June 25, 1992, (i) gives MONY a secured claim of $7 million, (ii) places MONY's deficiency claim "if any" in a separate class, and (iii) proposes to pay a total of 20% of the deficiency claim over 5 years at a 5% interest rate.

### IV.

██ Under § 362(g) of the Code, the debtor bears the burden of proving that the case was filed in good faith, and that there are no grounds establishing cause to grant relief from the stay.

██ After reviewing all of the facts and circumstances presented to the Court in evidence and by the parties' stipulation, the Court has concluded that this case was indeed filed in bad faith, and therefore the relief MONY requests should be granted. The Court reaches this conclusion based on its findings described in detail below, that Main and the debtor each individually acted in bad faith as to MONY and that the relationship between Main and the debtor evolved and continues in bad faith.

### A.

The Court begins by finding that Main and Kojaian Management acted with the Honigman firm in bad faith as to MONY by transferring this property on the eve of the filing of the foreclosure action in state court. The Court makes that ultimate finding based on these facts:

First, the transfer violated at least the spirit if not the letter of the standstill agreement between the parties. The evidence reflects a series of phone calls and facsimile exchanges in which a series of threats were made by Mr. DeMars, and perhaps other attorneys of the Honigman firm. In the Court's view, these threats were improper and amounted to sharp practice on the attorneys' part. These communications specifically included a threat to sue MONY and attempt to hold MONY responsible on a wide range of potential tort and contract claims if MONY named Main in a foreclosure action.

Further evidence of the bad faith of Main, Kojaian Management, and indeed the Honigman firm, in connection with the transfer of this property to the debtor is the statement by Mr. DeMars that he and his client would stay up nights thinking of ways to keep MONY from getting the building. Indeed, the letters that were transmitted to MONY's attorneys from Honigman as much as explicitly indicate that the purpose of the transfer to the debtor was to shield and protect the other interests of the transferors.

And finally, evidence of the bad faith of the transferors is found in the very odd terms and conditions of the transfer itself, which the Court will address below.

### B.

The Court also finds that the relationship between Main and the Kojaian entities, putatively as transferor on the one hand, and Mr. Balinski and the debtor as transferee on the other hand, must be seen as more than an ordinary transferor/transferee relationship. A number of considerations lead to this conclusion, which the Court will review, in no particular order of importance.

First, Kojaian Management has continued to occupy the debtor's space on a rent-free basis, despite the fact that Mr. Kojaian terminated its lease, and moreover, despite the fact that there is no direct contractual relationship between Kojaian Management and the debtor. The evidence establishes that Kojaian Management's management

contract is with MFS, which is Mr. Balinski's corporation. MFS' contract is with the association, which has ultimate responsibility for managing the building. While it is true that the debtor controls the association as owner of the majority of condominiums in the building, the debtor does not have a direct management contract with Kojaian, or even an indirect one through MFS.

Thus, the debtor is essentially giving it property away to Kojaian Management for services and consideration which it owes not to the debtor, even indirectly, but rather to MFS, and to the condominium association. Now, it might be appropriate to have these kinds of loose relationships in connection with a business enterprise that is successful and solvent, but when insolvency arises with its concomitant fiduciary duties, the law simply does not permit the debtor to be so lax in its business dealings.

Second, Main, pursuant to the agreement for additional consideration, has lent to the debtor $25,000 with no interest on a non-recourse basis without security. The debtor used this money first to pay its attorney in the foreclosure action, and then its attorney in connection with this bankruptcy action. Indeed, the agreement for additional consideration provides that Main will lend to the debtor money for, "certain verifiable costs and expenses," which are then unnamed. Agreement with Respect to Additional Consideration, Pl.'s Ex. K, ¶ 4. This certainly leads to the inference that the parties themselves recognized Main's direct financial interest in the debtor's ultimate financial success when they entered into this agreement.

Third, the initial consideration which the debtor agreed to pay to Main for the property is very oddly stated. The initial agreed-upon purchase price was the amount of the debt owing by Main to MONY, approximately $13.5 million, or the fair market value of the property, whichever is lower. The debtor specifically did not assume the mortgage, and so Main essentially gave the building to the debtor for no initial consideration because the fair mar-

ket value of the property was substantially less than the balance due on the mortgage.

On the other hand, with respect to the additional consideration for the transfer, Main maintains an 80 to 90% beneficial interest in the proceeds from any ultimate sale or refinancing. The agreement with respect to additional consideration states specifically the formula under which Main's beneficial interest shall be calculated.

Fourth, the debtor has scheduled in this bankruptcy, and has proposed in its plan to pay, Main's pre-transfer debts. These debts were never formally assumed by the debtor, and indeed Main had previously agreed to indemnify and hold the debtor harmless from those debts. Needless to say, the debtor's payment of those debts will likely prejudice its own creditors by reducing the dividend available to them.

Fifth, with regard to the transfer itself, there was no proration of taxes or other liabilities.

Sixth, Mr. Balinski's testimony indicated that the Honigman firm represented Main and he represented himself in the transfer negotiation. Still the Honigman firm had represented Mr. Balinski in many of his prior transactions, and so Mr. Balinski must have relied to a greater or lesser extent, probably greater, on Honigman's attorneys in connection with this transaction.

In the Court's view, it is a dubious proposition that this transfer was negotiated at arm's length. Indeed, on May 16, 1991 Mr. DeMars wrote to MONY's counsel, indicating that the Honigman firm had been retained by the debtor in connection with the impending foreclosure action, and further indicating that the Honigman firm was authorized to accept service for the debtor.

Finally, the Court notes that Mr. Balinski was introduced to this transaction through the Honigman firm, which acted at various times as counsel for both sides.

These factors suggest that the relationship between Main and Kojaian Management on one side, and Mr. Balinski and the debtor on the other, was plainly more than that of mere transferor/transferee, and

support the conclusion that the debtor filed this petition in bad faith.

### C. .

The Court further concludes the evidence establishes that the debtor and its principal, Mr. Balinski, have acted in bad faith throughout its ownership of the subject property.

Mr. Balinski knew of the substance, if not all of the details, of the difficulties between MONY and Main, including the important fact that the debt owing to MONY was greater than the value of the property. Mr. Balinski also knew that in order to make a profit on this deal, the debt to MONY would have to be reduced one way or another. In fact, his affidavit indicated that he offered a settlement, presumably pre-petition, to MONY, which would involve a reduced debt to MONY in the amount of $7 million. That of course is consistent with his post-petition plan which would pay MONY $7.7 million plus 20% of the unsecured portion of the debt.

Further evidence of the debtor's own bad faith is that over time Mr. Balinski has only placed approximately $3,000 into this deal for certain minor incidental expenses, and that the corporation itself was never substantially capitalized. Here the Court notes that Mr. Balinski's pre-existing corporation, MFS, has been receiving $1,500 per month as a result of its management contract with the condominium association. That is the net amount after $5,500 is received and $4,000 a month is paid to Kojaian Management.

Mr. Balinski has been unwilling to make any capital contributions that are necessary to attract new tenants, although he has fully recognized the need to make such expenditures. Rather, Mr. Balinski has taken the position that MONY should fund those tenant improvements, and he has refused to do so because in his view, it would be "a gift to the other side." In the Court's view, this evidences an attitude on his part that the risk of this enterprise should be borne by MONY rather than by him and the debtor as owners.

Further evidence of that attitude is found in the plan itself, pursuant to which Mr. Balinski intends to place $250,000 of new capital into the debtor, but *only* as part of a plan that also would propose a cramdown of the debt against MONY in this Chapter 11 case.

All of this suggests, and the Court finds, that the debtor and Mr. Balinski have used this bankruptcy, and went into this transaction, with the intent of getting the debt to MONY reduced rather than paying it. Or stated another way, the debtor got into this deal for the purpose of either negotiating or forcing MONY through this bankruptcy to take a cramdown on the amount of the debt. Or stated yet another way, the Court finds that the debtor is using this bankruptcy to create and organize a new business, and it is not using this bankruptcy to reorganize and rehabilitate its previously successful existing enterprise, or for the purpose of preserving any going concern value. In the Court's view, all of this is an abuse of the bankruptcy process and the Court concludes that this bankruptcy was filed for the improper purpose of delaying or frustrating MONY's legitimate efforts to enforce its rights.

## V.

The Court, therefore, will grant relief from the stay. The Court concludes in its discretion that it is appropriate in these circumstances to annul the stay, rather than simply to lift the stay, with the effect that the foreclosure which took place shortly after the bankruptcy was filed will be allowed to stand.