In the Matter of WASHTENAW/HURON INVESTMENT CORPORATION NO. 8, Debtor.

Bankruptcy No. 92-0454.
No. 92-76851.

United States District Court,
E.D. Michigan, S.D.

April 12, 1993.

Deborah L. Fish and Sharon M. Woods, Detroit, MI, for plaintiff.

Barbara J. Rom, Detroit, MI, for defendant.

### OPINION AND ORDER AFFIRMING DECISION OF BANKRUPTCY COURT

EDMUNDS, District Judge.

This matter came before the Court upon the debtor's appeal of the bankruptcy court's decision to annul the automatic stay. The bankruptcy court held that because the debtor filed its bankruptcy petition in bad faith, it was not entitled to the benefits of an automatic stay. For the reasons set forth below, the bankruptcy court's decision is hereby affirmed.

### I. Facts

In its opinion dated January 11, 1993, the bankruptcy court set forth certain undisputed facts as follows:

On June 29, 1988, Main Huron Associates Limited Partnership (Main) borrowed $12.7 million from MONY (the loan), to purchase real property located at One North Main Street, Ann Arbor consisting of residential condominium units and commercial and retail office space (the property). Main executed certain documents in connection with the loan (collectively, the loan documents), including:

a. Note Secured by First Real Estate Lien (the note);

b. Mortgage and Security Agreement (the mortgage) encumbering the retain and office space described as Units 1 and 2 and 16 through 29;

c. Master Lease; and

d. Assignment of Lessor's Interest [in all leases of the property, including the master lease] (the assignment).

Main is a Michigan limited partnership and its general partners are Albert Enterprises Associates Limited Partnership (Albert Partnership), Jon Fox, Harold Koss, and Richard McCoppin. Albert Partnership is a Michigan limited partnership and its general partner is Albert Enterprises, Inc. (Albert Enterprises). Albert Enterprises is a Michigan corporation with the following officers and directors: Mike Kojaian, President and Director; Kenneth J. Kojaian, Vice President, Secretary, and Director; C. Michael Kojaian, Vice President, Treasurer, and Director. Kojaian Management Corp. (Kojaian Management) is a Michigan corporation and its officers and directors are identical to those of Albert Enterprises.

The master lease was executed contemporaneously with the loan documents. The tenants under the master lease are the general partners of Main, and the full performance of the tenants' obligations under the master lease is guaranteed by Mike Kojaian, C. Michael Kojaian, Kenneth Kojaian, Jon Fox, Harold Koss and Richard McCoppin. The master lease expired in June, 1991.

Approximately $2 million in delinquent lease payments were paid in April, 1991 to Main, and the funds were paid to Main insiders. At the same time, Main and MONY entered into a letter agreement under which MONY promised not to take any action against the property before May 17, 1991. The purpose of the agreement was to give the parties time to negotiate a settlement.

The debtor was incorporated on January 25, 1991 as M–Tel Corporation; on January 31, 1991 its name was changed to Alanna Corporation, effective January 25, 1991; and on May 1, 1991 its name was changed to its current name and its registered agent was changed from Gregory J. DeMars of Honigman, Miller, Schwartz & Cohn (the Honigman firm) to Adrian J. Balinski. Mr. Balinski is the sole stockholder and president of the debtor.

Main conveyed the property to the debtor by quit claim deed dated May 16, 1991 (the deed), which was recorded with the Washtenaw County Register of Deeds on that date at 4:18 p.m. The closing statement from the sale of the property to debtor recited the payment of $100 net cash to Main for the property, with the purchase price as the lesser of $13,521,666.67 or the "fair market value as determined by an appraiser." Closing Statement, Pl.'s Ex. J. Main and the debtor also executed an "Agreement With Respect to Additional Consideration," dated as of April 28, 1991.

The building in which the property is located is managed by a condominium association (the association). Mr. Balinski is on the board of directors of the association. The association hired Mortgage and Financial Strategies, Ltd. (MFS) to manage the property on its behalf. According to the records of the Michigan Department of Commerce, MFS was incorporated in October, 1988, its registered agent and secretary is John E. Amerman, an attorney with the Honigman firm, and its president is Mr. Balinski. MFS, in turn, subcontracts the management of the property to Kojaian Management. The association pays a management fee equal to five percent of monthly rents. At the 341 examination, Mr. Balinski estimated that the monthly management fee paid to MFS is approximately $5,500, of which approximately $4,000 is paid to Kojaian Management.

After receiving notice of the May 16, 1991 quit claim deed, MONY filed a foreclosure action in Washtenaw County Circuit Court on May 21, 1991, against the debtor and Main. On February 10, 1992, an opinion and order was entered in that case in favor of MONY. The debtor filed its Chapter 11 petition on April 9, 1992, just a few hours before MONY's scheduled foreclosure sale. Unaware that a bankruptcy petition had been filed by the debtor, the foreclosure sale was conducted on April 9, 1992, at which time the property was sold.

The debtor's proposed plan of reorganization filed on June 25, 1992, (i) gives MONY a secured claim of $7 million, (ii) places MONY's deficiency claim "if any" in a separate class, and (iii) proposes to pay a

total of 20% of the deficiency claim over 5 years at a 5% interest rate.

*In re Washtenaw Huron Investment Corp. No. 8,* 150 B.R. 31, 32–33 (Bankr.E.D.Mich. 1993).

## II. Standard of Review

The decision to lift or annul the automatic stay is within the discretion of the bankruptcy court. 11 U.S.C. § 362(d). Thus, this Court must apply an abuse of discretion standard in reviewing the bankruptcy court's decision to annul the automatic stay. *Stephens Indus. Inc. v. McClung,* 789 F.2d 386, 391 (6th Cir.1986). A district court must apply a clearly erroneous test to findings of fact and plenary review to findings of law. *In re Charfoos,* 979 F.2d 390, 392 (6th Cir.1992).

## III. Bad Faith Standard

Under the law of the Sixth Circuit, there is no particular test for determining whether a bankruptcy petition was filed in good faith. Good faith is evaluated "under flexible and multiple standards," *Charfoos,* 979 F.2d at 393, and is determined on an ad hoc basis. *In re Zick,* 931 F.2d 1124, 1129 (1991).[1] *See also In re Barrett,* 964 F.2d 588, 591 (6th Cir.1992) ("Our circuit's good faith test requires consideration of the totality of circumstances.")

The seminal Sixth Circuit case regarding good faith is *Matter of Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir.1985). In *Winshall,* the court dealt with a motion to dismiss a Chapter 11 petition on the ground that the petition was filed in bad faith. The court emphasized that the purpose of Chapter 11 is to aid a distressed business by giving it "breathing space" to return to a viable state. *Id.,* at 1137. Key factors in determining whether a Chapter 11 petition was filed in good faith include "whether the debtor had any assets, whether the debtor had an ongoing business to reorganize, and

whether there was a reasonable probability of a plan being proposed and confirmed." *Id.*

Subsequently, the Sixth Circuit outlined a different standard for determining good faith in a Chapter 7 case in *In re Zick.* After noting that good faith must be determined ad hoc, the court noted:

> [Good faith] should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence.

931 F.2d at 1129. Most recently, the Sixth Circuit considered the issue of good faith in the Chapter 13 context in *In re Charfoos,* 979 F.2d 390. The court confirmed that bad faith is an ad hoc determination, evaluated under various flexible standards, but specifically noted that bad faith should only be found in egregious cases, quoting *Zick.* 979 F.2d at 392.

In this case, the bankruptcy court relied on the recent discussion and analysis of the law regarding good faith set forth in *Matter of Laguna Assoc. Ltd. Partnership,* 147 B.R. 709, 715 (Bankr.E.D.Mich.1992). In *Laguna,* the bankruptcy court held that there was no particular test for determining whether a bankruptcy petition was filed in good faith. The court noted that other jurisdictions have cited a myriad of factors in determining the issue of good faith. For example, the Eleventh Circuit in *In re Natural Land Corp.,* 825 F.2d 296 (11th Cir.1987) set forth the following general factors:

(1) the lack of a realistic possibility of effective reorganization;

(2) evidence that the debtor seeks merely to delay or frustrate secured creditors' enforcement of their rights;

(3) evidence that the debtor seeks to use bankruptcy to create and organize a new

---

1. The issue of good faith arises in various contexts under bankruptcy law. It may arise as a basis for lifting the automatic stay, as here, or it may arise as a basis for dismissing a petition under Chapter 7 or Chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 707(a) & 1112(b). There

is no reason to distinguish among criteria set forth in the case law under these various provisions, as good faith is an implicit jurisdictional requirement in all bankruptcy cases. *Zick,* 931 F.2d at 1127.

business instead of to reorganize and preserve a going concern;

(4) timing of the debtor's actions;

(5) whether the debtor is a mere shell corporation;

(6) whether the debtor was created or the property was transferred to the debtor for the sole purpose of obtaining protection under the automatic stay provision of Chapter 11.[2]

The *Laguna* court held that a court "may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions,' in particular, facts which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of se-cured creditors to enforce their rights.' " *Id.,* at 716 (citation omitted).[3]

 This Court agrees with the analysis set forth in *Laguna;* however, a finding of bad faith must be limited by the *Zick* standard. Thus, in determining whether a debtor filed a bankruptcy petition in bad faith, a court should consider factors which demonstrate an intent to abuse the bankruptcy process or which demonstrate that the bankruptcy petition was filed to frustrate the efforts of secured creditors to enforce their rights. A bad faith finding may be made only in egregious circumstances based on conduct akin to fraud, misconduct, or gross negligence. In this case, the bankruptcy court properly found, based on the totality of the circumstances, that the debtor filed its bankruptcy petition in bad faith.[4]

---

**2.** Similarly, the Fifth Circuit in *In re Little Creek Development Co.,* 779 F.2d 1068 (5th Cir.1986) set forth other more specific factors:

(1) the debtor has one asset;
(2) the pre-petition conduct of the debtor has been improper;
(3) there are only a few unsecured creditors;
(4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
(5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;
(6) the filing of the petition effectively allows the debtor to evade court orders;
(7) the debtor has no ongoing business or employees; and
(8) the lack of possibility of reorganization.
The Sixth Circuit cited the *Little Creek* factors with approval in *Charfoos.* 979 F.2d at 393. The *Laguna* court also discussed the factors which establish bad faith as exemplified by "new debtor syndrome" bankruptcy filings:
(1) transfer of distressed real property into a newly created or dormant entity
(2) transfer occurring within close proximity to the bankruptcy filing
(3) no consideration being paid for the transferred property other than stock in the debtor;
(4) debtor having no assets other than the recently transferred, distressed real estate;
(5) debtor having minimal unsecured debts;
(6) debtor having no companies and no ongoing business;
(7) debtor having no means, other than the transferred property, to service the debt on the property.
*Laguna* 147 B.R. at 716 (citing *In re Yukon Enterprises, Inc.,* 39 B.R. 919 (Bankr.C.D.Cal. 1984)).

**3.** The *Laguna* case was decided five weeks after *Charfoos.* The *Laguna* court does not cite *Charfoos* and likely did not have the benefit of the *Charfoos* decision.

**4.** The debtor also contends that the bankruptcy court's finding of bad faith was premature because the court failed to reach the issue of the possibility that the debtor's proposed plan of reorganization would be confirmed. However, the Bankruptcy Court's finding of bad faith was not premature under the standard set forth in *Charfoos.* In *Charfoos,* the court affirmed the district court's dismissal of the debtor's Chapter 13 petition, finding that the debtor's prepetition conduct demonstrated bad faith. The district court made its finding based on the debtor's prepetition conduct as well as his proposed plan. The Sixth Circuit found that reliance on the plan was inappropriate, because the plan had not been considered by the bankruptcy court and thus was not properly before the court on appeal. Thus, the Sixth Circuit affirmed a finding of bad faith, without any consideration of the feasibility of the debtor's proposed plan of reorganization. Similarly, here the bankruptcy court did not reach the issue of whether the debtor's plan would be confirmed, Tr. 97–98. Nevertheless, the court found bad faith. The bad faith finding may be affirmed, without reaching the issue of whether the proposed plan could be confirmed. Other courts agree:

Because the bankruptcy court found that a bad faith filing had occurred, it properly did not change the consequences of that finding simply because of the debtor's possible equity in the property or potential for successful reorganization.... The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith.

*In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1395 (11th Cir.1988).

*IV. Facts Supporting Finding of Bad Faith*

██ Under section 362(g) of the Bankruptcy Code, the debtor bears the burden of proving that the bankruptcy filing was made in good faith. The bankruptcy court determined that the debtor filed the bankruptcy petition in bad faith because Main transferred the property to the debtor on the eve of foreclosure in a transaction that was not armslength. Because the debtor filed for bankruptcy in bad faith, the bankruptcy court held that the debtor was not entitled to the benefit of the automatic stay. The bankruptcy court stated as follows:

> [T]he debtor and Mr. Balinski have used this bankruptcy, and went into this transaction, with the intent of getting the debt to MONY reduced rather than paying it. Or stated another way, the debtor got into this deal for the purpose of either negotiating or forcing MONY through this bankruptcy to take a cramdown on the amount of the debt. Or stated yet another way, the Court finds that the debtor is using this bankruptcy to create and organize a new business, and it is not using this bankruptcy to reorganize and rehabilitate its previously successful existing enterprise, or for the purpose of preserving any going concern value. In the Court's view, all of this is an abuse of the bankruptcy process and the Court concludes that this bankruptcy was filed for the improper purpose of delaying or frustrating MONY's legitimate efforts to enforce its rights.

*In re Washtenaw,* 150 B.R. at 36. This Court must affirm the bankruptcy court's finding of bad faith, unless the finding of bad faith was clearly erroneous. *In re Barrett,* 964 F.2d 588 (6th Cir.1988).

██ The bankruptcy court considered the totality of the circumstances surrounding Main's transfer of the property to the debtor on the eve of MONY's filing of the foreclosure action. In making its finding of bad faith, the bankruptcy court chiefly relied on documentary evidence and the testimony of Douglas Hyman, the attorney who represented MONY in the foreclosure action.

The parties dispute whether the bankruptcy court properly admitted much of the testimony of Hyman regarding certain statements of Honigman attorney Gregory DeMars, counsel for Main. The debtor contends that these were statements made during settlement discussions and thus they should be inadmissible under Federal Rule of Evidence 408. Judge Rhodes admitted the testimony, ruling that although settlement discussions may not be admitted to prove liability or damages on a claim, they may be admitted regarding the issue of good faith. The parties also dispute whether Judge Rhodes gave too much weight to the testimony of Hyman and too little weight to the testimony of Adrian Balinski, principal of the debtor. The debtor also contends that the bankruptcy court should have considered proposed testimony of DeMars to contradict Hyman's testimony.[5] MONY contends that the bankruptcy court was correct in its weighing of the evidence as it is within the discretion of the trier of fact to determine from the totality of the evidence submitted how to weigh the testimony.

It is not necessary for the Court to address these issues. The disputes regarding the testimony of Hyman and the proposed testimony of DeMars are immaterial to this Court's review of the findings of the bankruptcy court, because the Court finds, without relying on the testimony of Mr. Hyman, that the bankruptcy court did not abuse its discretion in finding bad faith. In addition, it should be noted that the Court does not give any weight to the bankruptcy court's statements regarding phone calls, letters, and purported threats amounting to "sharp practice" on the part of the Honigman firm; those statements are gratuitous and excessive.

Based on the testimony of Balinski and various documents as set forth below, however, the bankruptcy court did not abuse its discretion in annulling the automatic stay; its finding that the debtor filed its bankruptcy petition in bad faith was not clearly errone-

---

**5.** The Debtor offered the DeMars testimony in its motion for reconsideration, which the Bankrupt-

cy Court denied.

ous. The most significant circumstances that led to the finding of bad faith include the facts supporting the finding that the property transfer from Main to the debtor was not armslength, the conduct of Balinski, and Main's violation of the spirit of the Stand Still Agreement between Main and MONY.

## A. The Property Transfer Was Not Armslength

The bankruptcy court found that the relationship between Main and the Kojaian entities as seller and the debtor and Balinski as purchaser was "more than an ordinary transferor/transferee relationship," 150 B.R. at 34, and that this relationship supported the finding of bad faith. 150 B.R. at 35. There were six factors that lead the court to this conclusion.

### 1. Relationship between Kojaian Management and the Debtor

Although the lease between Kojaian Management and Main was terminated when the property was transferred to the debtor, Kojaian Management continued to occupy space at the property on a rent free basis. Exhibit G, pp. 40–41.[6] There is no lease or other contract between Kojaian Management and the debtor for Kojaian's use of the space.

Further, Kojaian Management continued to manage the property after the transfer to the debtor. However, there is no direct contractual relationship between the debtor and Kojaian Management. The condominium association is responsible for managing the property. Although the debtor controls the association because it owns a majority of the units in the building, the association contracted with Mr. Balinski's company, MFS, for the management of the property. MFS, in turn, subcontracted with Kojaian Management for the management of the property.

6. Exhibit references are to exhibits received into evidence at the evidentiary hearing held in the *Bankruptcy Court on the Motion for Order Granting Relief* from Automatic Stay. MONY's exhibits are designated by letter. The debtor's exhibits are designated by number.

7. The loan was intended for "certain verifiable costs and expenses" which were unnamed. Plaintiff's Exhibit K, paragraph 4. The Debtor used the loan monies to pay its attorney for

Thus, the debtor has entrusted the management of the property to Kojaian Management. However, Kojaian Management is obligated to perform on behalf of MFS and ultimately to the condominium association, not on behalf of the debtor. While this kind of business relationship is appropriate when a business is solvent, "when insolvency arises with its concomitant fiduciary duties, the law simply does not permit the debtor to be so lax in its business dealings." 150 B.R. at 34.

### 2. $25,000 Loan from Main to the Debtor

Under the Agreement for Additional Consideration, Main loaned the debtor $25,000 with no interest. Exhibit K. The loan was non-recourse, and the debtor provided no security. The debtor agreed to pay the loan from proceeds received upon sale or refinancing of the property within the next eight years. Pursuant to this agreement, the debtor borrowed funds from Main to pay its attorneys. Exhibit N, pp. 52–59. Thus, it can be inferred that Main had a direct financial stake in the debtor's success.[7]

### 3. Purchase Price for the Property

The consideration that the debtor agreed to pay for the property also reflects that the transaction was not armslength. The purchase price was the lesser of the fair market value or the amount of the debt owed to MONY, approximately $13.5 million. The debtor did not assume the mortgage to MONY. Thus, the closing statement reflected:

Total Purchase Price: $13,521,666.67, or the fair market value of the Property as of May 16, 1991, as determined by an appraiser, whichever is less

services rendered in connection with the foreclosure and the bankruptcy. Thus, the question is raised whether, at the time the property was transferred, Main and the Debtor foresaw that the Debtor would file bankruptcy in order to reduce the debt on the property. The loan appears to reflect that the parties contemplated substantial attorney fees for litigation with MONY.

| | |
|---|---|
| Less mortgage balance owed to MONY, which Purchaser is taking subject to | $13,521,666.67 |
| Net cash due from Purchaser | 100.00 |

It should be noted that Mr. Balinski knew when Main transferred the property to the debtor that the loan was in default. Tr. at 71 [8] and 137–38; Exhibit S. Balinski also knew that the debt owed to MONY was greater than the value of the property.[9] Further, under the Agreement for Additional Consideration, Main retained an 80 to 90 percent beneficial interest (up to five million dollars) in the proceeds upon the sale or refinancing of the property.[10] Again, Main had a direct financial stake in the debtor's success.

### 4. *Debtor's Payment of Main's Debts*

Although the debtor did not expressly assume Main's debts and Main agreed to indemnify and hold the debtor harmless from Main's debts (Exhibit K, para. 8), in bankruptcy the debtor has scheduled many of Main's debts and has proposed to pay them in its proposed plan of reorganization. Tr. at 131–134. The debtor's payment of Main's debts will prejudice creditors of the debtor by reducing their recovery in bankruptcy.

### 5. *Failure to Prorate Taxes*

Main and the debtor did not prorate taxes or other liabilities upon transferring the property, as is typical in real estate transactions.

### 6. *Negotiation of Property Transfer*

The negotiation of the property transfer was not done at armslength. Balinski testified that while the Honigman firm represented Main, he represented himself in the transaction. Tr. at 73. However, the debtor retained the Honigman firm to represent it in the foreclosure action and authorized the firm to accept service for the debtor. Exhibit S. In addition, the Honigman firm had represented Balinski in the past.[11] Tr. at 119–20.

Other facts regarding the property transfer should be noted. The negotiation of the property transfer took only a "couple of hours." Tr. at 73. Counsel for Main had a shelf corporation ready for Balinski to use to purchase the property. Exhibit G, pp. 16–19. Moreover, the newly formed debtor corporation did not pay any employees, occupy office space, or write any checks. Exhibit N, pp. 49–50.

### B. *Conduct of Mr. Balinski*

Balinski knew when Main transferred the property to the debtor that the debt owed to

---

8. "Tr." refers to the transcript of the Bankruptcy Court hearing on the motion to lift the automatic stay on October 21, 1992.

9. The Debtor does not contest this fact. The Bankruptcy Court, without objection from the Debtor, took judicial notice of the fact that the real estate, according to the Debtor, was worth five million dollars at the time the Debtor filed certain schedules in bankruptcy. Tr. at 58–59. As of October 1, 1992, the property was appraised at $7.7 million. Exhibit 17.

10. The Agreement for Additional Consideration provides:

(6) In addition, Washtenaw/Huron agrees to pay to Main Huron, as additional consideration, part of any sale and/or refinancing proceeds with respect to the Premises as provided below within eight (8) years from the date hereof pursuant to the following terms:
(a) All sums loaned to Washtenaw/Huron by Main Huron
(b) After payment of the amount set forth in Paragraph 6(a) hereof: (I) Main Huron shall

receive 90% of the next $500,000.00 of sale and/or refinancing proceeds ...
(c) After payment of the amounts set forth in Paragraph 6(a) and (b) hereof: (i) Main Huron shall receive 80% of the remaining sale and/or refinancing proceeds ...; provided, however, that in no event will Main Huron receive more than Five Million and 00/100 ($5,000,000.00) Dollars of such sale and/or refinancing proceeds under this Agreement.
Exhibit K.
The real estate was worth five million dollars at the time the Debtor filed certain schedules in bankruptcy. Tr. at 58–59. Balinski estimated that, after the seven year proposed plan of reorganization was completed, the building would be worth about $9.6–$9.8 million, after cramming down the debt to MONY to $7.7 million. Tr. at 134.

11. The Bankruptcy Court also found that Balinski was introduced to the transaction through the Honigman firm. Balinski testified that John Amerman of Honigman first contacted him regarding the property at the request of Michael Kojaian. Tr. at 66.

MONY was greater than the value of the property, and that in order for the debtor to make a profit on the purchase of the property the debt to MONY would have to be reduced. Mr. Balinski made a settlement offer to MONY which involved MONY reducing the debt to $7 million. Exhibit 5.

Further, Balinski originally capitalized the debtor with a $1,000 promissory note which he never paid. Exhibit G, pp. 20–21. Despite the fact that Balinski's company, MFS, received $1,500 per month under its management contract with the condominium association,[12] Balinski never substantially capitalized the debtor. Balinski testified that he had only put in $3,000–$5,000 of his own funds into this deal. Tr. at 134.

In addition, Balinski has refused to put any money in the property for tenant improvements, although he recognizes the importance of such an investment and has requested MONY to do so. Tr. at 122–125; Exhibit 7; Exhibit 9. This displays an attitude that the debtor is not willing to bear the risk of the project, but instead wants the lender to bear the risk. The debtor points out that Balinski is willing to place $250,000 into the project as part of the Chapter 11 reorganization plan. However, this plan also calls for MONY to accept a cramdown of the debt. The debtor's proposed plan of reorganization filed on June 25, 1992, (i) gives MONY a secured claim of $7 million, (ii) places MONY's deficiency claim "if any" in a separate class, and (iii) proposes to pay a total of 20% of the deficiency claim over 5 years at a 5% interest rate.

## C. The Stand Still Agreement

The bankruptcy court found that the transfer of the property from Main to the debtor "violated at least the spirit if not the letter of the Stand Still Agreement." 150 B.R. 31, 34. On April 30, 1991, Main and MONY entered into a "Stand Still Agreement" whereby they agreed to a procedure for the collection of rents and the payment of certain operating expenses while the parties attempted to negotiate a settlement of their differences regarding the property and the loan docu-

ments. Exhibit O. The agreement also specifically provided, "Lender [MONY] and Borrower [Main] . . . agree not to disclose the nature of any purported defaults, negotiations or discussions between Lender and Borrower in connection with the Project on or before that date [May 17, 1991]." Thus, although the Stand Still Agreement did not prohibit Main from transferring the property, the essence of the agreement was that the parties agreed to maintain confidence until May 17, 1991 so that they could negotiate a settlement. MONY contends that Main disclosed the nature of the discussions between MONY and Main to the debtor when it transferred the property to the debtor. See Exhibits P, R, S, and T. Main contends that it did not violate the Stand Still Agreement when it transferred the property. Exhibit Q. The bankruptcy court did not find that Main actually violated the Agreement, merely that it violated the spirit of the Agreement. Such a finding was not an abuse of discretion.

## V. Conclusion

For these reasons, the bankruptcy court annulled the automatic stay, instead of merely lifting it, so that the foreclosure sale on April 9, 1992 would be allowed to stand. Even without crediting any of the testimony of Mr. Hyman, the Court concludes that the bankruptcy court did not abuse its discretion in finding that the debtor filed its bankruptcy petition in bad faith.

Being fully advised in the premises and having read the pleadings, the Court hereby AFFIRMS the bankruptcy court's decision to annul the automatic stay.

---

12. The Debtor pays $5,500 per month in management fees to MFS, and MFS subcontracts the management of the property to Kojaian Management at the rate of $4,000 per month.